## MARY ELLEN TORONTO v. CITY OF SHAKOPEE AND OTHERS.
## MINNESOTA ELECTRIC SERVICE COMPANY, RELATOR.[1]

October 30, 1942.

Nos. 33,216, 33,249.

*Francis G. Thompson* and *Reynolds & McLeod,* for relator Minnesota Electric Service Company.

*L. N. Foster* and *E. A. Linnee,* for respondents City of Shakopee and Travelers Indemnity Company.

JULIUS J. OLSON, JUSTICE.

*Certiorari* to review an order of the industrial commission awarding compensation to the widow of Dean Toronto. The issue is whether at the time of his fatal injury the employe was working for the city of Shakopee or for relator, the Minnesota Electric Service Company. The referee found relator to be such employer, and on appeal the industrial commission unanimously affirmed.

[1]Reported in 6 N. W. (2d) 45.

Neither relator nor the city produces electric energy, and neither has facilities for its production. The city purchases power from the Northern States Power Company not only for its own distributing system, which is wholly within the city limits, but also to service relator's customers, some 100 in number, in an area adjacent to but outside the corporate limits of the city. The city resells the electric energy required by relator at a profit to itself.

Relator is a private corporation and owns and operates some 75 miles of transmission lines, which hook onto those of the city at the city limits, where the current is metered. The city's distributing system is managed by one Condon as superintendent of its water and light department. The city also employs a crew of linemen to maintain its system, and these are under the supervision and direction of Mr. Condon.

Toronto was a resident of Shakopee at the time of his death and had been for several years. His work was in the electrical field. He rendered service to the city from time to time, and, as an individual enterprise, also did a lot of work wiring houses and making other electrical repairs and installations for private individuals and concerns.

Some time before the fatal accident, the customers of relator had complained to the Northern States Power Company that the service was inefficient and unsatisfactory, whereupon the latter took steps to have the service remedied. Through Mr. Condon, Toronto was informed that his services were wanted by relator. At the time this information was given Toronto was employed by the city. Shortly before July 2, Mr. Conroy, the president and general manager of relator, informed Condon that Toronto was needed, and the latter commenced work on that day. His job consisted of handling wires charged with electricity. These are referred to as "hot wires," and Toronto was called the "hot wire man." On the day in question, as he was making a last connection of these wires to complete his job, he was electrocuted.

The issue between the city on the one hand and relator on the other is a narrow one, relator's contention being that the city was

the real employer and that Toronto had been loaned to it for the particular service mentioned. Since the triers of fact have concluded that Toronto was an employe of relator and not of the city, the only problem we have is to determine whether the evidence supports that finding. A few of the facts may be thus summarized: Toronto had been paid at the rate of 75 cents per hour while he worked for relator, for whom he had rendered many services in the past and at various times. His regular pay when employed by the city was 60 cents per hour. When he worked for the city it was his custom to punch a clock registering the time when he started his work each day and likewise when he finished. The last day he worked was July 1. There the time clock stopped as far as Toronto was concerned. His death occurred on the ninth. In the meantime, the time clock had not been punched. Another factor pointing in the same direction is the fact that when Toronto went to work for relator he went to its yard and took the corporation truck and equipment needed and drove to the job. While this was done without any specific direction of relator, there is no question that relator well knew that this was what he did. He was simply following an established practice. The record discloses the following from the testimony of Mr. Conroy:

"Q. How did Mr. Toronto come out to the line where he worked, how did he get out there?

"A. He came down and got the truck and the stuff that he needed and wire and stuff in my yard.

"Q. That was at your yard in Shakopee?

"A. Yes.

"Q. Did you have to tell him to do that or did he know?

"A. He knew, because when he worked for me he always knew where everything was and went down and got the stuff.

"Q. That was the corporation truck?

"A. Yes."

In addition, Condon, the superintendent of the city's light and water department, who stoutly maintained that Toronto was not

employed by the city at the time of the fatal accident, testified as follows:

"Q. You had a talk with Mr. Conroy after the death of Mr. Toronto, did you not?

"A. Yes.

"Q. Do you recall the conversation?

"A. Yes, part of it at least.

"Q. Will you relate it?

"A. Mr. Conroy came to me and, of course, told me how bad he felt and he wanted to know if I would be willing to do what I could to help the widow, and I said I would be glad to do anything I could to help Mrs. Toronto because Dean was a very good friend of mine, and I would do anything that was right to help her, and *Mr. Conroy wanted to know if there was some way I could fix it so that it would appear that he was on the city payroll, and I told him as far as I could see, that was out.*" (Italics supplied.)

There are other facts which could be related in support of the conclusion reached by the commission, but we think enough has been recited to obviate the necessity of going into further detail.

Writ discharged and award affirmed.

So ordered.